**VAN SCHAICK et al. v. McCARTHY et al. and three other cases.**

Nos. 2109–2112.

Circuit Court of Appeals, Tenth Circuit.

Jan. 6, 1941.

Oscar R. Ewing, of New York City (Hughes, Richards, Hubbard & Ewing, of New York City, Grant, Shafroth & Toll and Morrison Shafroth, all of Denver, Colo., Larkin, Rathbone & Perry, of New York City, Cass M. Herrington, of Denver, Colo., Davis, Polk, Wardwell, Gardiner & Reed, of New York City, Pershing, Nye, Bosworth & Dick, of Denver, Colo., Stewart & Shearer, A. M. Lewis, and Thomas O'G. FitzGibbon, all of New York City, James H. Pershing and Robert G. Bosworth, both of Denver, Colo., and W. A. W. Stewart, of New York City, on the briefs), for appellants.

Henry McAllister, of Denver, Colo., for appellees.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

PHILLIPS, Circuit Judge.

The Denver and Rio Grande Western Railroad Company[1] is the owner of certain lines of railroad located in Colorado, Utah, and New Mexico. Its main line extends from Denver, Colorado, southerly to Pueblo, Colorado, and thence westerly to Rifle, Colorado, and from Grand Junction, Colorado, northwesterly through Salt Lake City, Utah, to Ogden, Utah. The main line between Rifle and Grand Junction, Colorado, is owned by the Rio Grande Junction Railway Company[2] and is operated under lease by the Rio Grande, which owns all the Junction Company's outstanding stock. The Rio Grande also owns a line extending southwesterly from Pueblo through Walsenburg and Alamosa, Colorado, to West Willow Creek, Colorado. It also owns certain branch lines extending from the lines above referred to, in Colorado, Utah and New Mexico.

The Denver and Salt Lake Railroad Company[3] owns and operates a line of railroad extending westerly from Denver through Orestod, Colorado, to Craig, Colorado.

The Rio Grande's main line between Denver and Ogden is circuitous, and on October 15, 1928, the Rio Grande entered into a trackage agreement for the joint use of the Salt Lake line between Utah Junction, near Denver, and Orestod, to take effect upon the construction of the Dotsero Cutoff extending from Orestod on the Salt Lake line in a southerly direction to Dotsero, Colorado, on the Rio Grande line, a distance of approximately 38 miles.

The Dotsero Cutoff was completed in June, 1934, by the Denver and Salt Lake Western Railroad Company,[4] a wholly owned subsidiary of the Rio Grande. The stock of the Salt Lake Western is pledged to the Reconstruction Finance Corporation·as security for a loan to the Rio Grande.

Since the completion of the Dotsero Cutoff, the Rio Grande has operated a substantial number of its freight and passenger trains between Ogden and Denver over its main line extending from Ogden to Dotsero, over the Dotsero Cutoff, under its lease from the Salt Lake Western and over the Salt Lake line

through its joint trackage agreement. The Rio Grande also operates its original line through Pueblo, where it interchanges with the Missouri Pacific Railroad Company. The line from Denver to Ogden via the Salt Lake and the Dotsero Cutoff is approximately 173 miles shorter than the main line from Denver through Pueblo to Ogden.

Between the years 1930 and 1934, the Rio Grande acquired all but 460 shares of the outstanding 50,000 shares of the Salt Lake, all of which it pledged to the Reconstruction Finance Corporation as security for loans. On December 4, 1939, 3,651 shares of the Salt Lake stock owned by the Rio Grande were released from the pledge and sold.

Substantially all of the Colorado and New Mexico lines of the Rio Grande are covered by a divisional first mortgage executed by a predecessor of the Rio Grande on July 15, 1886, and thereafter assumed by the Rio Grande, wherein the United States Trust Company of New York is trustee. The main line in Utah is covered by another divisional first mortgage executed by a predecessor of the Rio Grande on July 1, 1889, and thereafter assumed by the Rio Grande, wherein Central Hanover Bank and Trust Company is trustee. Subject to the last-mentioned mortgage, the main line in Utah is covered by another divisional mortgage executed by a predecessor of the Rio Grande on April 1, 1899, and thereafter assumed by the Rio Grande, which also covers as a first mortgage certain branch lines in Utah. In the last-mentioned mortgage the Guaranty Trust Company of New York is trustee. The line of the Junction Company is covered by a first mortgage dated December 1, 1889, in which the Central Hanover Bank and Trust Company is trustee. On December 20, 1924, the Rio Grande assumed and agreed to pay the bonds secured by the last-mentioned mortgage.

There are two system mortgages executed in 1924, the first being the Rio Grande's Refunding and Improvement Mortgage to the Chase National Bank of the City of New York, as successor trustee, and the second, junior to the first, being the Rio Grande's General

---

[1] Hereinafter referred to as the Rio Grande.

[2] Hereinafter referred to as the Junction Company.

[3] Hereinafter referred to as the Salt Lake.

[4] Hereinafter referred to as the Salt Lake Western.

Mortgage to City Bank Farmers Trust Company as trustee. Except for certain immaterial segments and certain liens on equipment which are in controversy, the two system mortgages are junior to the divisional mortgages above mentioned. The stock of the Junction Company is pledged under the system mortgages.

On November 1, 1935, the Rio Grande and the Salt Lake Western filed their separate petitions for reorganization under § 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. The petitions were approved and shortly thereafter, with the approval of the Interstate Commerce Commission, the court appointed Wilson McCarthy, Esq., and Henry Swan, Esq., as trustees of the Rio Grande, and Raymond L. Sauter, Esq., as trustee of the Salt Lake Western. Immediately thereafter these trustees qualified and ever since have acted as such.

The mortgages above referred to in terms give a lien upon the Rio Grande's income, and the mortgage trustees, in their several petitions in intervention filed under permission of the court granted between February 8 and April 3, 1936, prayed for sequestration and impounding of the Rio Grande's income.

On January 3, 1940, the trustees of the Rio Grande, after due notice to all parties, brought on for hearing their petition for approval of the 1940 improvement program, including about 250 separate items. The trustees estimated the total cost of the improvements would be $3,021,762 and the cash requirements $2,-834,503. The Rio Grande's estimated net income for 1940 was $2,819,195 and was to be used to meet the cash requirements. The District Court entered its order approving various items embraced in the petition, but deferred certain other items until January 29, 1940. The hearing on the deferred items came before the court on February 6, 1940. On that date, appellant Insurance Group Committee was permitted to intervene, and filed its answer objecting to the deferred items. Among the deferred items were the following:

Item 75—Dotsero-Chacra, Colorado, installation of central traffic control, with a charge to Road and Equipment Account of $146,100, Cash Requirement, $174,500.

Item 76—Installation central traffic control Tunnel-Midwest, Colorado, with charge to Road and Equipment Account of $39,660, Cash Requirement, $46,500.

Item 78—Installation automatic block signals, Bond to Dotsero, Colorado, with charge to Road and Equipment Account of $104,670, Cash Requirement, $109,850.

Item 141—Pueblo, Colorado, insulation and weatherstripping yard and A. R. T. offices and installation circulating coolers, with charge to Road and Equipment Account of $695, Cash Requirement, $695.

On February 8, 1940, the court entered its order No. 267, approving 14 items, including Items 75, 76, 78, and 141, and disapproving one item. In its order the court found that the items approved "are required for the protection and preservation of the properties of said Debtor in the hands of said Trustees to the end that they may safely and adequately serve the public and that it is to the interest of all parties concerned that such improvements should be made."

In the order it was provided: "(4) That all questions as to allocating the expenditures authorized by this order to particular divisions and parts of the railroad or other property of the Debtor, or the earnings thereof, which are separately subject to the liens of the various mortgages and deeds of trust, or are separately subject to lease, and all questions as to whether the making of such expenditures will result in creating any right of reimbursement as between such divisions and parts of the railroad or other property, be and hereby are reserved for future determination."

This appeal involves that part of the order approving Items 75, 76, 78, and 141.

Central Traffic Control, hereinafter called CTC, is a term applied to a system of railroad operation by means of which the movement of trains over routes and through blocks on a designated section of track or tracks is directed by signals controlled from a central point without requiring the use of train orders and without the superiority of trains. Block signals are essential to CTC operations.

The first installation of CTC on the Rio Grande line was between Tennessee Pass and Deen, Colorado, a distance of 6.9 miles, completed in October, 1928, which resulted in much saving of time, now averaging 1 hour and 30 minutes less time for a helper trip from Minturn to Tennessee Pass and return. The second installation was between Provo and Midvale, Utah, a distance of 33.2 miles, com-

pleted October 31, 1929, resulting in a saving of 14 to 43 minutes per train.

The policy of installing CTC, done in the interest of expedition of service, especially freight, was continued after the appointment of the trustees. The third CTC installation was between Midvale and Roper, Utah, a distance of 6.3 miles, completed in May, 1937. No data is available as to time saved by this installation. The fourth installation was between Grand Junction and Midwest, Colorado, a distance of 13.1 miles, completed in August, 1937, which resulted in the saving of 4 to 47 minutes per train east and 8 to 16 minutes per train west.

On April 23, 1936, the trustees filed their petition for approval of additional expenditures for improvements, Item 53 of which was for the installation of CTC between Midvale and Salt Lake City, Utah, at a cost of $84,000. On April 23, 1936, the District Court approved these expenditures. On December 21, 1936, the trustees presented to the court their 1937 improvement program, which included Item 75 for installation of CTC between Grand Junction and Palisade, Colorado, at a cost of $90,000. On December 28, 1936, the court approved the program. At the time of such approvals, the Insurance Group Committee was not a party to the reorganization proceedings, · but the mortgage trustees were. None of the mortgage trustees took exception to the approval of the items in the 1936 and 1937 improvement programs except the Central Hanover Bank and Trust Company which filed blanket exceptions to the order of the court without specification of the CTC item.

The CTC installations not only expedite train movements but result in very substantial annual savings in expenses. Item 75 of the 1940 program estimates an annual saving of $31,385 and Item 76 an annual saving of $12,569.

CTC is needed in the territory between Grand Junction and Dotsero because the two lines from the east converge at Dotsero, creating a density of traffic at that point. Before selecting the two additional points for installation of CTC, the trustees of the Rio Grande caused studies to be made, with the aid of experts from two signal companies, and the Rio Grande's Engineer of Maintenance of Way, Superintendent of Transportation, Signal Engineer, and Assistant General Manager. As a result of these studies, it was determined that such installations were required.

The primary object of the CTC installations is to expedite train movements and thereby shorten the time of freight shipments between Pacific Coast points and Chicago, and by so doing provide earlier deliveries at New York and other Atlantic Coast terminals. At the time of the hearing, shortened schedules had been proposed but had not yet been put into effect. Thereafter, the schedules were put into effect, but due to difficulties with lines east of Chicago, they were withdrawn. That they will be put into effect in the near future is reasonably certain.

The Rio Grande has to compete with the Union Pacific Railroad Company and other lines from the Pacific Coast to Chicago and it must be prepared to meet future schedules in order to maintain its competitive position. The court will take judicial notice of the fact that local traffic has largely been taken over by busses and trucks, and that railroads today must depend largely upon through traffic.

Item 78 of the 1940 program provides for the installation of automatic block signals upon the Dotsero Cutoff at an estimated cost of $109,600. The entire Rio Grande line from Salt Lake City to Pueblo via Dotsero is equipped with automatic block signals. Block signals are to be installed on the Salt Lake. When this is done the Dotsero Cutoff will be the only main line over which Rio Grande trains operate that will not have block signals. They are essential to safety of operation. The rail on the Dotsero Cutoff was secondhand when laid. Rail failures are developing on the line. Unless block signals are installed, it will be necessary to include in the 1941 budget $225,000 to replace old rail. The installation of block signals will extend the life of this rail for four years, and will effect an annual saving of $3,800 through elimination of track watchmen.

While the Dotsero Cutoff line is not covered by the mortgages, it is an essential link in the operation, and a very substantial portion of the Rio Grande traffic moves over the Salt Lake and the Dotsero Cutoff. It would seem that block signals on this short segment are necessary to safety and the efficient operation of the system as a whole.

During the pendency of the proceedings and up to October 31, 1939, the trustees had expended $19,172,436 for road and equipment and improvement of existing facilities. Of this amount, $14,275,087 was charged to Road and Equipment, and $4,897,349 to Operating Expenses.

■■■ A pledge of income does not become effective so long as the mortgagor is permitted to remain in possession of the mortgaged property and to receive and disburse the earnings. Although a railroad mortgage may in terms give a lien upon the profits and income, until possession of the mortgaged premises is actually taken or some equivalent act done, the earnings belong to the railroad company and are subject to its control.[5] The ordinary method of making the lien upon profits and income effective is to obtain the appointment of a receiver in the foreclosure proceedings.

■■■ A railway is a unit. It must be sold, if at all, as a going concern. Its activities cannot be halted because its continuous, uninterrupted operation is necessary in the public interest. It is obvious that Congress regarded reorganization as the most feasible solution of the problem presented when a railroad corporation becomes insolvent or unable to meet its debts as they mature; that it deemed reorganization through equity receiverships as unsatisfactory; and that it enacted § 77 to provide a more efficient and satisfactory proceeding for reorganization of railroads. It was enacted pursuant to the power delegated to Congress to pass uniform laws on the subject of bankruptcies. While the Congress may not impair the obligation of contracts by laws acting directly and independently to that end, it has authority to enact legislation on the subject of bankruptcies which may operate collaterally or incidentally to impair or destroy the obligation of private contracts. Continental I. N. Bank v. Chicago, R. I. & P. Ry. Co.; 294 U.S. 648, 680, 55 S.Ct. 595, 79 L.Ed. 1110.

Sec. 77 provides that if the petition is approved, the court during the pendency of the proceeding shall have exclusive jurisdiction of the debtor and its property wherever located, and shall have and may exercise, in addition to the powers conferred by § 77, all the powers which a federal court would have if it had appointed a receiver in equity of the property of the debtor. It provides that the plan shall include provisions modifying or altering the rights of creditors generally, or of any class of them, secured or unsecured, either through the issuance of new securities or otherwise; shall provide for fixed charges, including fixed interest on funded debt, interest on unfunded debt, amortization of discount on funded debt, and rent for leased railroads, in such an amount that after due consideration of the probable prospective earnings of the property in the light of its earnings and experience and all other relative facts, there shall be adequate coverage of such fixed charges by the probable earnings available for the payment thereof; and shall provide adequate means for the execution of the plan which may include the modification of liens, indentures, or other similar interests, the extension of maturity dates of outstanding securities, the reduction of principal and rate of interest, and alteration of other terms of such securities, and the issuance of securities in exchange for existing securities. It provides that the court shall appoint one or more trustees of the debtor's property, and that such trustee or trustees shall have all the title, and shall exercise, subject to the control of the court, all the powers of trustees appointed pursuant to § 44 of the Bankruptcy Act, 11 U.S.C.A. § 72, and the powers of a receiver in an equity proceeding.

■■■ Sec. 77 has for its main purpose the rehabilitation of the debtor by a readjustment of its financial structure in the interest of the debtor and its creditors and security holders, under a fair and equitable plan of reorganization which shall so modify or alter the rights of both secured and unsecured creditors that the fixed charges shall be brought within the probable future earnings available for the payment thereof. During the process of reorganization it contemplates the continued corporate existence of the debtor under the control and supervision of the court.[6]

[5] Atlantic Trust Co. v. Dana, 8 Cir., 128 F. 209, 219; Fosdick v. Schall, 99 U.S. 235, 253, 25 L.Ed. 339; Southern Railway v. Carnegie Steel Co., 176 U.S. 257, 275, 20 S.Ct. 347, 44 L.Ed. 458.

[6] Thompson v. Louisiana, 8 Cir., 98 F. 2d 108, 110; Case v. Los Angeles Lumber Co., 308 U.S. 106, 113, 125, 126, 60 S.Ct. 1, 84 L.Ed. 110.

It may be doubted that, in view of the objects and purposes of § 77 and the means provided for their accomplishment, a secured creditor is entitled during the pendency of the proceeding to have income sequestered and subjected to the lien of his mortgage. Sec. 77 does not contemplate sale and liquidation or the application of earnings to the payment of mortgage securities. On the contrary, it provides for a fair and equitable plan of reorganization[7] and a just allocation of the securities of the reorganized company, taking into consideration not only the principal but the unpaid interest on mortgage obligations. But we prefer not to rest our decision on this narrow ground.

Sec. 77 provides for the submission of the plan to the Interstate Commerce Commission, for a public hearing before the Commission, for a certification of the plan to the court, and for a hearing before the court. It further provides that if the judge does not approve the plan, he may refer it back to the Commission for further action. It is manifest that a considerable period of time must necessarily elapse before a satisfactory and proper plan can be worked out and receive the requisite approval. During that period the railroad company must be operated by the trustees under the supervision and control of the court in the public interest and for the protection of the private interests involved, and to that end such expenditures must be made as are reasonably necessary to preserve and protect those interests and maintain the ·integrity of the railroad, so that it may be turned over to the reorganized company as a going concern. Sec. 77 contemplates that the reorganized road shall be a living, not a dying, railroad enterprise. To permit the competitive position· of the road to be lost during the period of reorganization would greatly endanger the future earnings upon which the plan is to be largely based and out of which the reduced fixed charges are to be paid.

The Rio Grande competes with the Union Pacific Railroad Company and other lines for through traffic from the Pacific Coast to Chicago. Because of the inroads made by busses and trucks, railroads today must depend largely upon through traffic. The Rio Grande has been operated under the provisions of § 77 since November 1, 1935. While plans of reorganization have been before the Commission and the court, no plan has yet received the joint approval of both. During this period of trusteeship, it is manifest that the Rio Grande may not stand still. It must go forward with such improvements and betterments as are essential to maintain its competitive position, both present and prospective. Otherwise, at the end of the reorganization proceedings it will find itself unable to maintain its competitive position and will face the loss of future earnings out of which the fixed charges under the plan will have to be paid.

We do not mean to imply that the trustees should be authorized to make expenditures which are not clearly necessary. On the contrary, we are of the opinion that all proposed expenditures for improvements should be carefully scrutinized by the trial court and should be rigidly limited to what is reasonably and necessarily required to adequately maintain the railroad as a going concern and enable it to perform its public functions. Indeed, we think the court should exercise not only a sound but a restrained discretion in passing upon whether expenditures are essential to those ends. Large amounts have already been expended in the rehabilitation of lines and equipment and it would seem that future expenses could and should be substantially curtailed.

We are of the opinion, however, upon the facts presented, that Items 75, 76, and 78 are necessary to maintain the competitive position of the Rio Grande with other lines and to insure that it will receive its fair share of through traffic now and in the future, and are, therefore, essential to preserve its integrity and usefulness as a railroad to the end that it may perform its public functions and be turned over to the reorganized company as a going concern.[8]

---

[7] § 77, sub. e(1), Bankruptcy Act; Case v. Los Angeles Lumber Co., 308 U. S. 106, 114, 60 S.Ct. 1, 84 L.Ed. 110.

[8] See American Brake Shoe & Foundry Co. v. Pere Marquette R. Co., 6 Cir., 205 F. 14, 19, 20; Finance Co. of Pennsylvania v. Charleston, C. & C. R. Co., 4 Cir., 62 F. 205, 208; Union Trust Co. v. Souther, 107 U.S. 591, 594, 2 S.Ct. 295, 27 L.Ed. 488; Miltenberger v.

With respect to Item 141, we think it is clearly not required to the maintenance of the railroad as a going concern and that it should have been disapproved.

The order in so far as it approves Items 75, 76, and 78 is affirmed. That portion of the order approving Item 141 is reversed and the cause remanded with instructions to enter an order disapproving Item 141. Let the costs in this court be assessed equally against the parties.

Logansport Ry. Co., 106 U.S. 286, 310, 1 S.Ct. 140, 27 L.Ed. 117; In re St. Louis Southwestern Ry. Co., D.C.Mo., 17 . F.Supp. 68, 71, affirmed, Bankers Trust Co. v. Henwood, 8 Cir., 88 F.2d 163.