**In the Matter of LEHIGH VALLEY RAILROAD COMPANY, Debtor.**

**Appeal of CITIBANK, N. A. (formerly known as First National City Bank), as Indenture Trustee of the Lehigh Valley Harbor Terminal Railway Company Mortgage Indenture, dated February 1, 1924, as supplemented.**

No. 76–2020.

United States Court of Appeals, Third Circuit.

Argued Feb. 24, 1977.

Decided June 3, 1977.

As Amended Oct. 12, 1977.

---

William R. Traub, Duane, Morris & Heckscher, Philadelphia, Pa., for appellee, Robert C. Haldeman, Trustee of the Lehigh Valley R. Co., debtor.

John E. Hoffman, Jr., Andrew S. O'Connor, New York City, for appellant, Citibank, N.A., as indenture trustee; Shearman & Sterling, New York City, of counsel.

Charles A. Horsky, Covington & Burling, Washington, D. C., James E. Howard, Philadelphia, Pa., for Robert W. Blanchette, Richard C. Bond and John H. McArthur, Trustees of the Property of Penn Central Transp. Co., debtor, for amici curiae.

Before GIBBONS, FORMAN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

FORMAN, Circuit Judge.

This is an appeal, taken pursuant to the Bankruptcy Act, 11 U.S.C. § 47, from Order No. 362 of the United States District Court for the Eastern District of Pennsylvania, entered in the Lehigh Valley Railroad reorganization proceedings. Order No. 362 denies the petition of Citibank, N.A., as Indenture Trustee of a certain mortgage bond issue on which Lehigh Valley is the obligor, for the sequestration of rent derived from the mortgaged property.[1]

### I.

On July 24, 1970, the Lehigh Valley Railroad Company commenced proceedings in reorganization under Section 77 of the Bankruptcy Act, 11 U.S.C. § 205 (1964). On May 2, 1974, after a hearing, the District Court determined, as required by § 207(b) of the Regional Rail Reorganization Act of 1973, Pub.L. 93–236, 45 U.S.C. §§ 743, 744 ("the Rail Act"), that the Lehigh Valley Railroad is not independently reorganizable on an income basis under § 77 within a reasonable time. The District Court held a further hearing in June, and on July 1, 1974, entered its 180-day order, in which it determined that the Rail Act does not provide a process which would be fair and equitable to the estate of Lehigh Valley, and therefore, that the reorganization of its estate should not be carried out pursuant to

1. The order provides:
   "[I]t appearing that granting the relief requested would impermissibly interfere with the formulation and implementation of a plan of reorganization for the Debtor's estate, it is ORDERED that the Petition is hereby DENIED."

the Rail Act.[2] The Special Court,[3] on September 30, 1974, reversed the District Court's 180-day order and directed reorganization to proceed under the Rail Act.[4] The Special Court's order directing reorganization under the Rail Act was affirmed by the Supreme Court in *Regional Rail Reorganization Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

In accordance with the provisions of § 77 and the Rail Act, the Trustee of the Estate of Lehigh Valley continued to operate a railroad system until April 1, 1976. As of April 1, 1976, the Lehigh Valley Trustee, pursuant to the Final System Plan of the United States Railway Association,[5] transferred a major portion of the railroad's properties to Consolidated Rail Corporation ("Conrail"). Conrail assumed the responsibility for operating this portion of Lehigh Valley's property and the Lehigh Valley Trustee has had no further obligation to operate ongoing railroad facilities since April 1, 1976.

Appellant, Citibank, N.A., is the successor Trustee under the Lehigh Valley Harbor Terminal Railway Company[6] First Mortgage Indenture, dated February 1, 1924, as supplemented, securing *inter alia*, the payment of principal, in excess of $4 million, and interest on the Lehigh Valley Railroad's 5% First Mortgage Gold Bonds due in 1984. The Bonds and the Indenture Agreement require Lehigh Valley to pay interest in respect of the Bonds semiannually on February 1 and August 1 of each year. Lehigh Valley has paid no interest on the Bonds since it commenced reorganization proceedings on July 24, 1970.

The Indenture Agreement grants to the appellant an interest in certain non-operating property of Lehigh Valley, known as the Claremont Terminal Property, as security to the Bondholders. The Indenture further provides[7] that if Lehigh Valley shall default in the payment of any installment of interest and such default shall continue for sixty days, appellant shall be entitled to collect all earnings, income and rents from the mortgaged property.

The Claremont Terminal Property is rail-served[8] industrial property which generates an annual income of almost $350,000.00 from fourteen leases to which it is subject. The income from the Claremont Terminal Property, representing approximately 76% of the total lease rentals derived from the holdings of the Debtor's Estate is being utilized by Lehigh Valley's Trustee to meet

---

**2.** *In re Lehigh Valley Railroad Co*, 382 F.Supp. 854 (E.D.Pa.1974).

**3.** The Special Court was established under § 209(b), 45 U.S.C. § 719(b) (1970 ed., Supp. III), as a single three-judge district court of all judicial proceedings with respect to the Final System Plan.

**4.** *In re Penn Central Transportation Co.*, 384 F.Supp. 895 (Special Court 1974).

**5.** Congress established the United States Railway Association (USRA) as a new Government corporation under § 201(a), 45 U.S.C. § 711(a) (1970 ed., Supp. III). The USRA was charged with preparing a "Final System Plan" for restructuring the railroads in reorganization into a "financially self-sustaining rail service system." § 206(a)(1), 45 U.S.C. § 716(a)(1) (1970 ed., Supp. III). The Final System Plan, issued July 26, 1975, provides for the transfer of designated rail properties by the railroads in reorganization to Consolidated Rail Corporation, a private state-incorporated corporation, in return for securities of Conrail, plus up to $500 million of USRA obligations guaranteed by the United States, and "the other benefits accruing to such railroad by reason of such transfer." § 206(d)(1), 45 U.S.C. § 716(d)(1) (1970 ed., Supp. III).

**6.** The Lehigh Valley Railroad Company is successor by merger to the Lehigh Valley Harbor Terminal Railway Company.

**7.** Article 5, Section 2 of the Indenture Agreement states in pertinent part:

"Section 2. If . . .

"(a) default shall be made in the payment of any installment of interest on any of the bonds secured hereby when and as the same shall become payable, as therein and herein expressed, and such default shall continue for the space of sixty days . . .

". . . the Trustee shall be entitled to collect and receive all tolls, earnings, income, rents, issues and profits of the same and every part thereof."

**8.** The Claremont Terminal Property rail facilities were among those transferred by Lehigh Valley to Conrail pursuant to the Final System Plan.

current expenses of administering the estate.

Appellant, as Indenture Trustee, petitioned the District Court to enter an order (a) impressing a trust upon the rents in the possession of the Debtor's Trustee derived from the Claremont Terminal Property and directing that such funds be deposited in an escrow account for the purpose of protecting the security of the Bondholders, and (b) sequestering future income derived from the Claremont Terminal Property and requiring the deposit of such funds in an escrow account for the benefit of the Bondholders. The District Court entered Order No. 362, without an opinion, denying appellant's petition on the ground that it "would impermissibly interfere with the formulation and implementation of a plan of reorganization for the Debtor's estate." [9]

Appellant argues that Lehigh Valley's use of income derived from the Claremont Terminal Property, to pay for current expenses incurred by the Debtor's liquidation, constitutes an inequitable impairment of the Bondholders' security.

## II.

Section 77 of the Bankruptcy Act was enacted in 1933 to deal with the rights of creditors in railroads which were suffering severely from the effects of over-capitalization and the loss of revenue, among other things.[10] Under § 77 the debtors' trustees were given the responsibility for development of a reorganization plan, under supervision of the Interstate Commerce Commission, which would restructure the capitalization of the railroad but not its physical operations.[11] Prior to enactment of the Rail Act, the only orders that could be entered in a railroad reorganization under § 77(b) were an income-based reorganization or a dismissal.

9. See note 1, *supra.*

10. See *Railroad Reorganization Under the Regional Rail Reorganization Act of 1973: An Overview,* 40 Albany L.Rev. 812 (1976).

11. Bankruptcy Act § 77, 11 U.S.C. § 205 (1970); see Barber, *Railroad Reorganization, Section 77*

Now, the federal district court with jurisdiction over the § 77 reorganization of each debtor railroad must determine whether to continue reorganization under § 77 or to seek reorganization under the Rail Act. In the instant case, the District Court determined that Lehigh Valley is not independently reorganizable on an income basis under § 77 within a reasonable time and thus ordered reorganization to proceed under the Rail Act.

■ Reorganization under the Rail Act, pursuant to the Final System Plan,[12] involves the transfer of a major portion of the railroad properties and the obligation to operate a railroad from Lehigh Valley's Trustee to Conrail. The principal purpose of this physical restructuring of the railroad "is to reorganize the regional rail structure, not to determine the rights and priorities of creditors and stockholders of the bankrupt railroad. These matters remain governed by § 77 of the Bankruptcy Act, which continues in effect except where specifically contradicted by the Rail Act." [13] Since the culmination of reorganization under the Final System Plan is the exchange of substantially all of Lehigh Valley's rail properties for Conrail stock, it is necessary to identify the statutory basis for the District Court's assumption of reorganization jurisdiction under § 77 after adoption of the Final System Plan.

Section 618(b) of the Railroad Revitalization and Regulatory Reform Act of 1976 (P.L. 94–210), amended the Rail Act by adding section 601(b)(4), 45 U.S.C. § 791 (b)(4). The amendment, which went into effect on February 5, 1976, reads:

"(4) The powers and duties of the Commission under section 205 of Title 11, with respect to a railroad in reorganization in the region which conveys all or substantially all of its designated rail

*and the Need for Legislative Reform,* 21 U.C.L. A.L.Rev. 353 (1973).

12. See note 5, *supra.*

13. "An Overview", *supra,* note 10 at 828.

properties to the Corporation or a subsidiary thereof, or to profitable railroads in the region, pursuant to the final system plan, and the requirement that plans of reorganization be filed with the Commission, shall cease upon the date of such conveyance. The powers and duties of the Commission under section 205 of Title 11 shall also so terminate, as of February 5, 1976, with respect to any railroad in reorganization under such section 205 of Title 11 but not subject to this chapter which (1) does not operate any line of railroad, and (2) has transferred all or substantially all of its rail properties to a railroad in reorganization in the region which was subject to this chapter prior to February 5, 1976. Thereafter, such powers and duties of the Commission shall be vested in the district court of the United States which has jurisdiction of the estate of any such railroad in reorganization at the time of such conveyance. Such court shall proceed to reorganize or liquidate such railroad in reorganization pursuant to such section 205 of Title 11 on such terms as the court deems just and reasonable, or pursuant to any other provisions of the Bankruptcy Act, if the court finds that such action would be in the best interests of such estate. This paragraph does not affect any obligation of any carrier by railroad subject to regulation under the Interstate Commerce Act. The powers and duties of the Commission under section 205 of Title 11 shall continue in effect only to the extent that the railroad in reorganization continues to operate any line of railroad."

■ It appears that this section explicitly authorizes the continuation of reorganization proceedings under Section 77, even where it is no longer possible to reorganize the debtor as a railroad. Thus, the District Court which has jurisdiction of the estate of a railroad in reorganization, which transfers all of its railroad properties, retains jurisdiction to "liquidate such railroad in reorganization pursuant to such section [77]." It is the duty of the reorganization court to decide whether the best interests of the debtor's estate dictates that reorganization

or liquidation proceed under Section 77 or some other provision of the Bankruptcy Act.

■ Section 601(b)(4) was enacted more than six months after publication of the Final System Plan and almost two months before the actual transfer of railroad property from Lehigh Valley to Conrail. Under the Final System Plan, none of the debtor railroads will operate any train lines. Although some of the railroads have retained property with rails on it, the United States Railway Association has determined that those rail lines are not profitable to operate. Congress must have been aware, when it enacted this section, that none of the railroad estates would actually be operating trains any longer. Therefore, Section 601 may be read as vesting in the reorganization courts the jurisdiction to receive and proceed with a § 77 reorganization plan of railroads which are no longer operating trains or to determine whether the interests of those estates would best be served by applying some other section of the Bankruptcy Act. Section 601 reflects Congress's recognition that once a railroad has transferred its working railroad property, pursuant to the Rail Act, the interests in its reorganization which were the proper concern of the Interstate Commerce Commission are no longer present, and that the Commission's powers and responsibilities should, under those circumstances, be exercised by the reorganization court. Absent any finding by the District Court in the instant case regarding the relative benefits to the estate of proceeding under some other section of the Bankruptcy Act, it would appear that Lehigh Valley's Trustee may proceed under § 77 to file a plan of reorganization or liquidation with the District Court.

Furthermore, a number of recent cases have suggested that a railroad's reorganization under § 77 may continue even after it is no longer possible to reorganize the Debtor's estate as a working railroad.

In the *New Haven Inclusion Cases,* 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691

(1969), the Supreme Court permitted a § 77 proceeding to continue and a reorganization plan to be filed where the reorganization was designed to relieve the debtor of all responsibility for operating a railroad. The Court approved the New Haven Trustee's plan of reorganization under § 77 even though it provided for the New Haven estate to become a passive holding company which would transfer all of its rail operations to the Penn Central Transportation Company. The Supreme Court noted that:

> "Together, the [reorganization] court and the [Interstate Commerce] Commission 'unquestionably' had 'full and complete power not only over the debtor and its property, but also as a corollary, over any rights that [might] be asserted against it.' *Callaway v. Benton*, 336 U.S. 132, 147, 69 S.Ct. 435, 444, 93 L.Ed. 553. One such power was precisely that which the Commission was about to propose that the reorganization court exercise—the power to confirm a plan of reorganization providing for 'the sale of all . . . of the property of the debtor . . . .' Bankruptcy Act, § 77(b)(5), 11 U.S.C. § 205(b)(5)." 399 U.S. at 421, 90 S.Ct. at 2073.

*In re Tennessee Central Railway Co.*, 304 F.Supp. 789 (N.D.Tenn.1969), also affirms the proposition that a debtor railroad, which has divested itself of all railroad property, may nevertheless continue its reorganization pursuant to § 77. There, the Tennessee Central Railway Co. initiated reorganization proceedings under § 77, in December of 1967. The Interstate Commerce Commission, concluding that the Debtor was hopelessly insolvent, authorized abandonment by Tennessee Central of its entire line of railroad. Shortly thereafter, three railroads began operating substantially all of the Tennessee Central's former lines. These three railroads subsequently purchased those lines which they respectively operated. One month after title to the properties passed to the three railroads, the United States of America filed a petition requesting an order terminating reorgani-

zation proceedings under § 77 and requesting further that the Government be permitted to file a complaint for the appointment of a general equity receiver to liquidate the estate of the debtor. The reorganization court denied the Government's petition to terminate the § 77 proceedings, observing that all the parties, from the outset of the § 77 proceedings, recognized that it was virtually impossible to maintain the operation of the Debtor as a functioning railroad. The efforts of the Trustee were directed toward a total withdrawal of the debtor from common carrier operations and an eventual sale of the debtor's lines to other carriers who would continue to supply substantially all of the service previously supplied by the debtor. While no plan of reorganization *per se* had yet been presented to the court, the reorganization court held that the underlying purposes of § 77 had been accomplished by the court through the effort of the Trustee:

> "In the present reorganization proceedings, substantial compliance with the statute has been obtained. As Mr. Justice Reed observed in his majority opinion in *Ecker v. Western Pacific R. Corp.*, 318 U.S. 448, 481–482, 63 S.Ct. 692, 711, 87 L.Ed. 892 (1943): 'Sound railroad reorganization involves more than the partitioning of assets among creditors * * *. The interest of the public in an adequate transportation service must receive consideration.' While it is true that no actual plan of reorganization has been filed, the Trustee's sale of operating lines and other assets has accomplished the primary results envisaged by the statute—a continuation of railroad service to the public." 304 F.Supp. at 793.

In *Connecticut General Ins. Corp. v. United States Ry. Ass'n*, 383 F.Supp. 510 (E.D. Pa.1974) a three-judge court [14] held that the Rail Act was unconstitutionally defective for failure to provide a remedy for any unconstitutional erosion of property caused by mandatory interim operations before adoption of the Final System Plan. The court further held that § 207(b) of the Rail

**14.** Convened pursuant to 28 U.S.C. §§ 2282, 2284.

Act, which mandates dismissal of the § 77 proceeding if the procedures of the Rail Act are rejected, was unconstitutional because it precluded recourse to § 77 where the debtor attempted to use that section to produce a form of liquidation. The court stated:

"At first blush, [§ 207(b)] might seem relatively innocuous: Since the particular debtors have been found to be incapable of reorganizing 'on an income basis' under § 77, dismissal of the § 77 proceeding might be thought to follow as a matter of course.

"But a § 77 proceeding may properly lead to results other than a 'normal' income-based reorganization of a railroad as a railroad. The *New Haven Inclusion* case, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970), stands as a prime example of a type of reorganization designed to produce permanent withdrawal of the debtor from common carrier operations. There, the rail assets were disposed of, with a view toward reorganizing the enterprise as an investment holding company. The plan of reorganization was approved by the ICC, the reorganization court, and the Supreme Court.

"It thus appears that § 77 can be used to produce a form of liquidation, at least where the plan contemplates that the bulk of the rail properties will continue to be operated as a railroad by someone." 383 F.Supp. at 534.

The *Connecticut General* case, consolidated with several other cases [15] challenging the constitutionality of the Rail Act, was reversed by the Supreme Court in *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). In discussing the validity of the Rail Act under the uniformity requirement of the Bankruptcy Clause, the Supreme Court specifically referred to the New Haven situation, and portions of the above-quoted language of the three-judge court. Noting the lower court's finding that the Rail Act adds nothing to the powers already granted to reorganization courts under § 77, the Supreme Court continued:

"The [lower court] determined, however, that one provision of the Rail Act is 'newly created or added by the [Rail] Act.' Section 207(b) requires the reorganization court to dismiss the § 77 proceeding if it finds that the railroad is not reorganizable on an income basis within a reasonable time, *and* that the Rail Act does not provide a process which would be fair and equitable to the estate of the railroad in reorganization. The District Court noted that the *New Haven Inclusion Cases, supra,* held that inasmuch as the plan disposed of the New Haven's assets to the Penn Central for continued operations, § 77 could be used to reorganize the enterprise as an investment holding company, 'at least where the plan contemplates that the bulk of the rail properties will continue to be operated as a railroad by someone.' 383 F.Supp., at 534. The District Court held that § 207(b) of the Rail Act precludes a like reorganization under § 77 by requiring dismissal of the § 77 proceedings, and to that extent violates the uniformity clause since this dismissal relates only to debtors within the region covered by the Rail Act.

"We need not decide whether the District Court was correct in this respect. Following the decision of the District Court, the Penn Central Reorganization Court issued its 180-day order finding that, although Penn Central is not reorganizable on an income basis under § 77, the Rail Act does not provide a process which would be fair and equitable to the debtor's estate. 382 F.Supp. 856, 870–871. Rather than dismiss the § 77 proceeding as required by § 207(b), however, the court stayed its order pending an appeal to the Special Court. The Special Court found that the processes prescribed in the Rail Act are fair and equitable if a remedy exists under the Tucker Act, and reversed. 384 F.Supp., at 910–911. The Rail Act expressly provides that this holding is nonreviewable. § 207(b). Al-

---

**15.** Including the *Lehigh Valley Railroad Reorganization Case,* Bky. No. 70–432, E.D.Pa.

though we need not address today the issue whether the judgment of the Special Court is subject to review, we do hold that the Tucker Act remedy is available for any uncompensated taking occurring under the Rail Act. That holding obviates the possibility that the Penn Central Reorganization Court will ever confront the provisions for dismissal of a § 77 proceeding under § 207(b) of the Rail Act." 419 U.S. at 157–58, 95 S.Ct. at 365 (emphasis in original).

Thus, the Court found it unnecessary to decide whether the compulsory dismissal requirement of § 207(b) of the Rail Act violated the uniformity clause, because under its holding that the processes prescribed in the Rail Act are fair and ·equitable, § 207(b) could not preclude the type of reorganization planned in the *New Haven* case. The Supreme Court implicitly reaffirmed its holding in *New Haven Inclusion Cases, supra,* that where a railroad is not reorganizable on an income basis, § 77 can be used to reorganize the enterprise to produce a permanent withdrawal of the debtor from common carrier operations. The only limitation which the Court seems to impose is that the reorganization "plan contemplates that the bulk of the rail properties will continue to be operated as a railroad by someone."

More importantly, the Supreme Court began its entire analysis with the observation that:

"Congress concluded that solution of the [regional railroad] crisis required reorganization of the railroads, stripped of excess facilities, into a single, viable system operated by a private, for-profit corporation. Since such a system cannot be created under § 77 rail reorganization law, and since significant federal financing would be necessary to make such a plan workable, Congress supplemented § 77 with the Rail Act . . . .." 419 U.S. 102 at 109, 95 S.Ct. at 342.

And addressing the issue of whether the Rail Act's provisions for judicial review are defective, the Court recognized that:

"[N]either the Rail Act itself nor the procedures thereunder finally determine the interests of the respective creditors. Those will be decided in the § 77 reorganization courts, which will distribute to creditors the consideration received for the rail properties." 419 U.S. at 154, 95 S.Ct. at 364.[16]

In reliance upon this language of the Supreme Court, the United States District Court for the Eastern District of Pennsylvania, in *In re Penn Central Transportation Co.,* 395 F.Supp. 567, 574–75 (E.D.Pa.1975), concluded that it must retain jurisdiction under § 77

"in all respects until there is a Final System Plan, and with respect to the properties (both rail and nonrail) not included in the Final System Plan, and for the purpose of reorganization around the assets which will remain after the conveyances ordered by the Special Court. Although it has been suggested that future events may point to the advisability of converting the § 77 proceeding into some other form of reorganization under the bankruptcy laws, until that happens the § 77 proceedings must be continued. Indeed, the Supreme Court was able to avoid addressing one aspect of the uniformity issue by noting that the § 77 proceedings have not been dismissed. And finally, it should be pointed out that although the RRRA gives to the Special Court all of the powers of a reorganization court, the Special Court's jurisdiction is limited to 'all judicial proceedings with respect to the final system plan' (§ 209(b)); its appellate authority appears to have been limited to review of the orders entered under § 207(b). And § 601(b) of the Act provides merely that the provisions of the Interstate Commerce Act and the Bankruptcy Act '. .

**16.** The Court again stated at 419 U.S. 153, 95 S.Ct. 363:

"The Rail Act, like § 77 of the Bankruptcy Act, which the Rail Act supplemented, mere-

ly 'advances another step in the direction of liberalizing the law on the subject of bankruptcies.' "

are inapplicable to transactions under this Act to the extent necessary to formulate and implement the final system plan whenever a provision of any such act is inconsistent with this Act.'

"It therefore seems beyond question that this Court must continue to perform the functions contemplated by § 77 of the Bankruptcy Act."

In *In the Matter of Penn Central Transportation Co.,* 533 F.2d 1347 (3d Cir. 1976), this court regarded the obligation of the debtors' trustees and the reorganization court to protect the interests of creditors, as a duty that continues under § 77, beyond the provisions of the Rail Act:

"Although the Regional Rail Reorganization Act has supplemented and modified section 77 procedure to the extent necessary to accommodate the projected inauguration of rail service by a new corporate entity, the section 77 reorganization of Penn Central Transportation Company has not ended. The section 77 trustees and the reorganization court have not been relieved of their responsibility to consider and deal equitably with all claimants who have an interest in the Penn Central estate." 533 F.2d at 1352.

■ In sum, these cases provide persuasive support for the proposition that the reorganization of a railroad may properly continue under section 77 despite the fact that the enterprise is no longer capable of being reorganized into a working railroad. Several of the above-mentioned cases differ in only one respect from the situation of Lehigh Valley: the mechanics of the railroads' withdrawal from common carrier operations. For example, in the *New Haven Inclusion Case,* the reorganization plan itself, filed pursuant to § 77, contemplated the railroad's cessation of services. In the case of Lehigh Valley, however, the railroad's lines were transferred to Conrail un-

der the provisions of the Rail Act, prior to the formulation of any reorganization plan. But this distinction in no way reduces the jurisdictional authority which these cases provide.

The interest of the public in an adequate transportation service is being preserved by Conrail's operation of the debtors' rail lines. Yet, the railroad estates remain intimately involved in the affairs of the railroads. Under the Rail Act, the trustees have been compelled to devote many of the properties, not conveyed to Conrail, for continued rail operations. Section 304 of the Rail Act[17] continues to prohibit the trustees from abandoning these properties so that they can be operated under subsidy programs financed by the Federal Railroad Administration and the various states. Title to the rail properties not transferred to Conrail remains in the debtors' estates and the Interstate Commerce Commission requires the debtors to file financial reports as "lessor railroads."[18]

The Rail Act is a reorganization statute which supplements and partially supersedes section 77. Thus, rather than filing a plan of reorganization, which would have culminated in liquidation, solely on the basis contemplated by § 77, Lehigh Valley is being reorganized under § 77 by transferring substantially all of its rail properties to Conrail pursuant to the Rail Act, and then proceeding to liquidate pursuant to a plan of reorganization directly under § 77. It seems to have clearly been the intent of Congress, in enacting section 601(b)(4), and the conclusion of those courts which have considered the issue, that the reorganization courts do retain their jurisdiction under § 77 to reorganize or liquidate the debtor railroads after they have transferred their rail properties to Conrail pursuant to the Final System Plan. Thus, the District Court has jurisdiction over the § 77 reorganization of the

---

17.  45 U.S.C. § 744.

18.  In addition, the debtors are involved in protracted litigation in the Special Court concerning the valuation of their railroad properties and the valuation of Conrail securities which they received in consideration for the proper-

ties which were conveyed to Conrail. Ultimately, the § 77 reorganization courts must "distribute to creditors the consideration received for the rail properties." *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 154, 95 S.Ct. 335, 364, 42 L.Ed.2d 320 (1974).

Lehigh Valley Railroad to reorganize or liquidate the enterprise pursuant to § 77, or pursuant to any other provisions of the Bankruptcy Act, if the court finds that such action would be in the best interests of the debtor's estate.

### III.

■ Normally, where a secured creditor holds a mortgage on a debtor's property and the debtor initiates proceedings in bankruptcy, the secured creditor is equitably entitled to the rents and profits issuing from that property.[19] *In re Pittsburgh-Duquesne Development Co.,* 482 F.2d 243 (3d Cir. 1973); *Associated Co. v. Greenhut,* 66 F.2d 428 (3d Cir. 1933); *Bindseil v. Liberty Trust Co.,* 248 F. 112 (3d Cir. 1917). This court has held that a debtor's trustee may use income generated by property subject to a mortgage, if the income is necessary to sustain continuing operations in order to effectuate a plan of reorganization. *In re Penn Central Transportation Co.,* 484 F.2d 323, 335–336 (3d Cir.), *cert. denied,* 414 U.S. 1079, 94 S.Ct. 598, 38 L.Ed.2d 485 (1973); *In re Philadelphia & Reading Coal & Iron Co.,* 117 F.2d 976 (3d Cir. 1941); *Central Hanover Bank & Trust Co. v. Philadelphia & Reading Coal & Iron Co.,* 99 F.2d 642 (3d Cir. 1938). *Cf., Van Schaick v. McCarthy,* 116 F.2d 987 (10th Cir. 1941). As noted by Judge Fullam, in *In re Penn Central Trans. Co.,* 355 F.Supp. 1343, 1345 (E.D.Pa.1973): "The essence of § 77 of the Bankruptcy Act is that the legal remedies normally available to creditors may be held in suspension for a reasonable time in order to permit rehabilitation of the enterprise." Appellant argues that, in this case, however, there is no longer any possibility of a successful rehabilitation of the railroad, and the Lehigh Valley Trustee, therefore, should not be given unrestricted access to income

which, in equity, belongs to the Bondholders.

■ This court has articulated the underlying objective of Section 77 as:

"[F]irst, the rights of the creditors must be guarded; second, the public's interest in the survival of the railroad as a going enterprise must be respected."[20]

In the *Central Hanover, In re Philadelphia & Reading,* and *Penn Central* cases, the reorganization courts had to balance the conservation of debtors' assets for the benefit of the creditors with the preservation of an ongoing railroad in the public interest. In those cases, income from the mortgaged property or pledged stock was deemed essential to the continued operations of the railroad, which in turn was considered essential to rehabilitation of the enterprise pursuant to a plan of reorganization.[21]

In the instant case, it is apparent that the parties do not contemplate a successful rehabilitation of Lehigh Valley as an ongoing railroad. Indeed, the parties seem to agree that any plan of reorganization here will encompass a liquidation of all the estate's assets and their subsequent distribution to the creditors.

The adoption of the Final System Plan pursuant to the Rail Act has guaranteed the continuation of those rail services of Lehigh Valley which are vital to the public interest. The public no longer has any interest in the estate of Lehigh Valley either as a presently operating railroad or as an enterprise which could be reorganized into an operating railroad. Therefore the basic objective of the Debtor's reorganization proceedings under § 77 must be to protect the rights of the creditors, to which the Lehigh Valley Trustee agrees.

---

**19.** This is because after a petition in bankruptcy is filed and the bankruptcy court assumes control of the mortgaged property, the mortgagee is deprived of his ordinary remedy to take possession of the property and collect the rents. *Central Hanover Bank & Trust Co. v. Philadelphia & Reading Coal & Iron Co.,* 99 F.2d 642, 645 (3d Cir. 1938).

**20.** *In the Matter of Penn Central Transportation Co.,* 474 F.2d 832, 833–34 (3d Cir. 1973).

**21.** *See Central Hanover,* 99 F.2d 642 at 645; *In re Philadelphia & Reading,* 117 F.2d 976 at 978; *In re Penn Central Trans. Co.,* 354 F.Supp. 717, 737 (E.D.Pa.1972), *modified,* 484 F.2d 323 (1973).

The Trustee contends, however, that his use of income from the mortgaged property to finance litigation in the Special Court [22] and to formulate a plan of reorganization or liquidation will ultimately accrue to the benefit of all the creditors. Appellant argues that since these reorganization proceedings are no longer concerned with the public's interest in the operation of a railroad, the Lehigh Valley Trustee assumes a different burden than that which would normally be imposed in a § 77(b) reorganization. Appellant contends that the Lehigh Valley Trustee should be permitted to use the income from the mortgaged property, prior to the formulation of a reorganization plan, only upon a showing of probable benefit or absence of detriment to the Bondholders.

This Court has previously considered the permissible bounds of the district courts' discretion in the application and disposition of proceeds of the *sales* of mortgaged property under § 77(*o*) of the Bankruptcy Act, 11 U.S.C. § 205(*o*).[23] *See In re Penn Central Transportation Co.*, 474 F.2d 832 (3d Cir. 1973) (hereinafter *Penn Central*) and *Central Railroad of New Jersey v. Manufacturers Hanover Trust Co.*, 421 F.2d 604 (3d Cir.) *cert. denied*, 398 U.S. 949, 90 S.Ct. 1867, 26 L.Ed.2d 289 (1970) (hereinafter *Central Railroad*). In *Central Railroad* and *Penn Central* a test was articulated which required that the district court find that each of four conditions be present in order for it to permit utilization of the proceeds of the sales of mortgaged property. *Central Railroad* stated:

"The rule for a reorganization under Sec. 77 . . . is that [1] in addition to finding that the funds are presently needed and cannot be obtained elsewhere [2] the court need only conclude that reorganization is probably feasible, [3] that the money drawn-down and expended for additions and betterments will materially contribute to the possibility of successful reorganization and to the continuation of the transportation plant, or a substantial part thereof, as a going concern, and [4] that the interests of the bondholders are not thereby prejudiced." 421 F.2d at 606.

In the instant case, the District Court has not permitted utilization of the proceeds of the sales of mortgaged property, but has directed that such proceeds be held by commercial banks in corporate trust accounts for the account of mortgagees of the property and the Debtor's Trustee. The District Court has restricted the use of these proceeds and has granted the mortgagees the right to object to the proposed use of interest earned on the proceeds. Appellee has acknowledged that if the mortgaged property in question were sold, the proceeds "would be placed in the usual escrow account." [24]

In light of these arrangements for the protection of those secured creditors who hold mortgages on property which the Debtor happens to sell, appellant contends that the Lehigh Valley Trustee's unrestricted use of the income from the Claremont Terminal imposes a disproportionate and inequitable burden upon the Bondholders. We can find no legal justification for the disparate treatment in these proceedings of proceeds from the sale of mortgaged property, and the interest thereon, and income from the rental of mortgaged property. Nor do we discern any reason for the appli-

---

**22.** The Lehigh Valley Trustee is presently engaged in litigation, pursuant to the Tucker Act, before the Special Court concerning the valuation of the properties transferred to Conrail.

**23.** Section 205(*o*) states in pertinent part:
"The judge may order and decree any sale of property, whether or not incident to an abandonment, under this subsection at public or private sale and subject to or free from liens. The proceeds derived from any such sales shall be received by the trustee or trustees subject, in case the property was sold free from lien, to any liens thereon at the time of sale, and shall be applied or disposed of in such manner as the judge by further order shall direct. The expense of such sale shall be borne in such manner as the judge may determine to be equitable. The judge may order the trustee or trustees of the debtor to deposit such proceeds with any mortgage trustee entitled thereto, to be applied in payment of all or part of such mortgage."

**24.** Joint Appendix at 86A.

cation of different standards in the two instances. There is nothing in § 77 from which one may infer an intent to distinguish between property and income derived therefrom. *See In re Philadelphia & Reading Coal & Iron Co.,* 117 F.2d 976 (3d Cir. 1941).

*In re Colonial Realty Investment Co.,* 516 F.2d 154, 160 (1st Cir. 1975), considered whether, and under what circumstances, reorganization trustees should be permitted to use income from mortgaged property prior to the formulation of a plan of reorganization. The First Circuit held that the use of income from mortgaged property to finance administration of the estate should be permitted only if the reorganization court makes a threshold determination of "probable benefit, or, at least, no probable injury" to the secured creditors.

Although *Colonial Realty* involved a reorganization under Chapter XII of the Bankruptcy Act [25] rather than under § 77, the principles relied upon there apply with equal force to the instant case. "Chapter XII was enacted principally '. . . to furnish the same relief to individual debtors as is now available to corporations under Section 77B or under Chapter X of this bill.' H.R.Rep. No. 1409, 75 Cong., 1st Sess. (1936) at 51." [26] Furthermore, as previously explained, the Lehigh Valley reorganization under § 77 no longer involves the interest of the public or the concomitant policies attendant to the rehabilitation of an ongoing railroad. The only purpose of the instant proceedings is to protect the rights of the creditors.

The Lehigh Valley Trustee, relying upon *Van Schaick v. McCarthy,* 116 F.2d 987 (10th Cir. 1941), contends that until appellants take possession of the mortgaged property, the earnings belong to the Debtor's Estate and may be used to finance a plan of reorganization or liquidation. *Van Schaick,* in fact, held that a pledge of income does not become effective so long as the mortgagor is permitted to remain in possession of the mortgaged property and to receive and disburse the earnings. However, *Van Schaick* rested its decision on the ground that expenditures necessary for the maintenance of the railroad are proper because the continuous, uninterrupted operation of the railroad maximizes the value of the enterprise to the creditors and is vital to the public interest.[27] Neither justification is relevant to the instant proceedings. *Van Schaick* made it clear that the reorganization courts should exercise a restrained discretion in determining whether expenditures are "rigidly limited to what is reasonably and necessarily required to adequately maintain the railroad as a going concern and enable it to perform its public functions." [28] Moreover, the Tenth Circuit does not go as far as the Third in recognizing the equity interest of a secured creditor in the rental income derived from the mortgaged property during bankruptcy administration.

This circuit does recognize that after the institution of bankruptcy proceedings, a mortgagee is equitably entitled to rents from the mortgaged property as a portion of the security for repayment of the

---

**25.** 11 U.S.C. § 801 et seq.

**26.** *In re Colonial Realty Investment Co.,* 516 F.2d 154 at 157.

**27.** *Van Schaick v. McCarthy,* 116 F.2d at 993: "It is manifest that a considerable period of time must necessarily elapse before a satisfactory and proper plan can be worked out and receive the requisite approval. During that period the railroad company must be operated by the trustees under the supervision and control of the court in the public interest and for the protection of the private interests involved, and to that end such expenditures must be made as are reasonably

necessary to preserve and protect those interests and maintain the integrity of the railroad, so that it may be turned over to the reorganized company as a going concern. Sec. 77 contemplates that the reorganized road shall be a living, not a dying, railroad enterprise. To permit the competitive position of the road to be lost during the period of reorganization would greatly endanger the future earnings upon which the plan is to be largely based and out of which the reduced fixed charges are to be paid."

**28.** *Ibid.*

**150**

mortgage debt.[29]  The Lehigh Valley Trustee has not paid interest to the Bondholders since 1970 when it commenced reorganization proceedings, and it is unclear from the record whether the Debtor's Estate retains any equity whatsoever in the mortgaged property.  Yet the Lehigh Valley Trustee continues to utilize the entire income from this property to finance litigation which is not assured of success and which, even if successful, would inure to the benefit of *all* creditors.

It is true that the only purpose for the continuation of the present reorganization proceedings is to protect the rights of the creditors, but "the creditors" cannot be treated in all respects generically.  There must be some consideration given to the particular interests of the individual group of Bondholders who have a secured interest in the Claremont Terminal.  There must be some determination that the diversion of income from this property to finance the administration of the Debtor's Estate will not permanently dilute the security of the Bondholders.

The principles undergirding the four-pronged test adopted in *Central Railroad* and *Penn Central* reflect a balance between the interests of the creditors and those of the public.  Because the public no longer has any interest in the outcome of the Lehigh Valley reorganization, those factors articulated in the *Central Railroad* test relating to successful rehabilitation of the railroad have no significance here.  The remaining factors should guide the District Court's discretion in determining whether to permit the Debtor's use of income from the mortgaged property.  These factors are: (1) whether the funds are presently needed and cannot be obtained elsewhere and (2) whether the interests of the Bondholders will be thereby prejudiced.  In or-

der for the District Court to permit the utilization of rent from the Claremont Terminal to finance the Estate's operating expenses, the court must find both that the funds necessary to meet the operating deficits are not available elsewhere and that there is a probable benefit or likely absence of injury to the Bondholders.  It is not the role of the appellate court to apply this test in the first instance nor to portend the outcome of its application by the District Court.  Because the record does not reveal that the District Court made any findings with regard to these considerations,[30] Order No. 362 will be vacated and the appellant's petition remanded to the District Court for a threshold determination of these factors and further proceedings consistent with this opinion.

---

**29.**  *See In re Pittsburgh-Duquesne Development Co.,* 482 F.2d 243 (3d Cir. 1973); *Associated Co. v. Greenhut,* 66 F.2d 428 (3d Cir. 1933); *Bindseil v. Liberty Trust Co.,* 248 F. 112 (3d Cir. 1917).

**30.**  Citibank argues that by determining that sequestration of the rental income would inter-

fere with the formulation of a reorganization plan, the District Court implicitly reached the threshold determination of probable benefit or likely absence of injury to the secured creditors.  After scrutinizing the transcript of the sequestration hearing, we are unable to assume that such a determination was made.